UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| **DANIEL CAVAZOS** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NUMBER** |
| | § | **M-04-044** |
| **MICHAEL J. ASTRUE** | § | |
| **COMMISSIONER OF** | § | |
| **SOCIAL SECURITY** | § | |
| **Defendant** | § | |

## MEMORANDUM OPINION

Plaintiff Daniel Cavazos filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of the Social Security Administration's (Commissioner's) denial of his application for Social Security Disability Insurance Benefits (DIB) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (Docket No. 1.) Plaintiff claims that he is unable to work due to impairments resulting from poorly controlled diabetes. Pending before the Court are the parties cross-motions for summary judgment. (Docket Nos. 10 (Defendant), 21 (Plaintiff).)

In reviewing the Commissioner's denial of benefits, a federal court may not re-weigh the evidence or substitute its judgment for that of the Commissioner's. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence, including opinions from treating and other doctors suggesting that Plaintiff's condition does not preclude him from performing some types of work. For the reasons discussed further below, summary judgment will

be granted in favor of the Commissioner.

## I.  BACKGROUND[1]

Plaintiff filed an application for DIB on November 14, 2001, alleging that he became unable to work in February 2001 due to limitations caused by diabetes, including poor circulation in his legs and feet, and vision problems.  (Tr. 43–45, 54.)  Plaintiff's application was denied initially and on reconsideration. (Tr. 27–39.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on August 21, 2003 in McAllen, Texas.  (Tr. 40–42, 196–213.)  Following the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled within the meaning of the Social Security Act and not entitled to any period of DIB payments.  (Tr. 15–21.) Plaintiff's request for review of the ALJ's decision by the Appeals Council was denied.  (Tr. 4–14.) In filing this action, Plaintiff seeks review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Plaintiff was 44 years old and had completed about twenty-eight hours of college education. (Tr. 199–200.) His past work experience involved approximately fifteen years in sewing machine repairs and sales.  (Tr. 63.)

## A.     The Medical Evidence[2]

Plaintiff's earliest medical records are results from lab work related to a July 30, 1997 doctor's visit; these records, however, provide no description of any diagnosis.  (Tr. 169–76.)

---

[1]  The Commissioner has filed a transcript of the entire record of the administrative proceedings, which will be cited herein as "Tr."

[2]  Because the Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence, the medical evidence will be summarized in some detail.  *See Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

About three years later, in early 2000, Plaintiff began visiting Victor H. Gonzalez, M.D., regarding diabetes-related eye problems. (Tr. 123.) Plaintiff followed up regularly with Dr. Gonzalez throughout the remainder of that year and into early 2001. Dr. Gonzalez placed special emphasis on controlling Plaintiff's blood sugar and blood pressure levels. (Tr. 109–121.) In a letter to the Texas Rehabilitation Commission (TRC) dated February 12, 2001, Dr. Gonzalez indicated that Plaintiff had been under his exclusive care for severe diabetic retinopathy[3] of both eyes and that at Plaintiff's February 2001 visit his best corrected visual acuity was 20/30 in both eyes. (Tr. 108.) Dr. Gonzalez also indicated that Plaintiff was undergoing laser photocoagulation in the retinal periphery of both eyes as a result of his impairment. (*Id.*) Plaintiff was recuperating from bilateral vitreous hemorrhages at the time the letter was written. (*Id.*)

Plaintiff also sought treatment with Donna Gail Joule, M.D., at the McAllen Family Care Clinic. (Tr. 153.) In a October 26, 2000 visit to Dr. Joule, Plaintiff was noted to suffer from poorly controlled, non-insulin dependent diabetes mellitus, retinopathy, neuropathy of the feet and legs, and nephropathy.[4] (*Id.*) Plaintiff was prescribed medications and advised to return. (*Id.*) Plaintiff returned on November 30, 2000. He reported that he was not exercising and continued to complain of tingling in his feet. (Tr. 152.) However, there were no edema or lesions on Plaintiff's feet. (*Id.*) Dr. Joule prescribed additional medications and advised Plaintiff to monitor his diet, exercise, and

---

[3] Diabetic retinopathy is defined as "retinal changes occurring in diabetes mellitus, marked by microaneurysms, exudates, and hemorrhages, and sometimes by neovascularization." STEDMAN'S MEDICAL DICTIONARY 1561 (27th ed. 2000).

[4] Diabetic nephropathy is defined as "a syndrome occurring in people with diabetes mellitus and characterized by albuminuria, hypertension, and progressive renal insufficiency." *Id.* at 1191.

return for a follow-up.  (*Id.*)  Plaintiff continued to meet with Dr. Joule off and on through 2001, as reflected by medical records that often only noted adjustments to his prescription medications.  (Tr. 146–51.)  Plaintiff indicated to Dr. Joule in January 2001 that he did not want to take insulin shots.  (Tr. 151.)

In February 2001, Scott D. Spoor, M.D., completed a case assessment form.  Dr. Spoor concluded that Plaintiff's alleged limitations were not wholly supported by the medical records and that Plaintiff's impairments were non-severe.  (Tr. 86.)  On April 2, 2001, an ophthalmological report was prepared for TRC Disability Determination Services (DDS) based on a personal examination of Plaintiff.  (Tr. 88–92.)  With correction, Plaintiff's vision at a distance was 20/40 in both eyes, and his near vision was 20/30 in both eyes.  (Tr. 88.)  Plaintiff's retinopathy and vitreous hemorrhaging were confirmed, and he was advised to continue seeing Dr. Gonzalez regarding laser eye surgeries.  (Tr. 89.)  Dr. Spoor completed a Physical Residual Functional Capacity Assessment on April 4, 2001.  (Tr. 98–105.)  He found that Plaintiff had no visual limitations other than a diminished field of vision.  (Tr. 101.)  This condition suggested that Plaintiff should avoid exposure to dangerous environments at work, including proximity to heavy machinery and elevated walkways.  (*Id.*)

On August 28, 2001, Plaintiff was examined by Brian Glazer, M.D., at the request of DDS.  (Tr. 124–32.)  Dr. Glazer noted Plaintiff's complaints of pain in his hands, ankles, and hips.  But he also found that Plaintiff had no redness or swelling and stated that the pain did not cause Plaintiff to drop things.  (Tr. 126.)  Plaintiff indicated that he could carry groceries, ties shoes, climb a flight of stairs, walk half a block, and go shopping.  (*Id.*)  Dr. Glazer further noted that Plaintiff had not been hospitalized for his diabetes and had yet to start taking insulin.  (Tr. 124.)  Plaintiff's vision was

4

rated at 20/30 with correction in his right eye and 20/40 with correction in his left eye. (*Id.*) Dr. Glazer reported that Plaintiff had normal gait and coordination, a full range of motion in his shoulders, elbows, neck, hips, knees, ankles, and feet, and good muscle tone and strength. (*Id.*) No other significant findings were observed. Plaintiff appeared to be in good condition generally. Dr. Glazer diagnosed Plaintiff as having peripheral vascular disease with non-insulin dependent diabetes and borderline cardiomegaly (enlarged heart). (*Id.*)

On September 11, 2001, Dr. Gonzalez sent a second letter to DDS summarizing Plaintiff's ocular status. (Tr. 133.) Dr. Gonzalez recounted Plaintiff's impairments as "moderate diabetic retinopathy of both eyes and clearing vitreous hemorrhage of the right eye" and stated that Plaintiff had undergone laser photocoagulation in an attempt to stabilize his condition. (*Id.*) It was noted that on Plaintiff's last visit, April 9, 2001, his vision was rated at 20/30 in the right eye and 20/25 in the left with correction. (*Id.*) Dr. Gonzalez stated that he had instructed Plaintiff not to lift over twenty-five pounds and not to operate heavy machinery. (*Id.*) Plaintiff could, however, walk, stand, drive, hear, and talk normally. (*Id.*) The letter concluded that Plaintiff's condition was guarded at the time due to his uncontrolled diabetes mellitus and need for further laser photocoagulation. (*Id.*) The doctor instructed Plaintiff to strictly control his blood sugar and to return every four to six months for further management. (*Id.*)

Two weeks later, on September 24, 2001, Plaintiff had a follow-up visit with Dr. Joule. Plaintiff complained to Dr. Joule that he could barely see and that he was suffering from bleeding inside his eyes, among other blood pressure related ailments. (Tr. 148.) Dr. Joule also recorded that Plaintiff was completely out of medications and not taking his insulin. (*Id.*) A few weeks later, on October 16, 2001, Dr. Joule found that Plaintiff was doing better now that he was taking his insulin.

(Tr. 147.) But she also observed that he was still smoking, drinking, and not exercising. (*Id.*) In a full examination conducted that day, Dr. Joule noted that Plaintiff's feet showed good capillary refill. (*Id.*)

On September 25, 2001, Dr. Kelvin A. Samaratunga completed a Physical Residual Functional Capacity Assessment based on the medical record. (Tr. 134.) Dr. Samaratunga opined that Plaintiff could lift up to twenty pounds occasionally, ten pounds frequently, could stand or walk and sit for six hours in an eight-hour work day, and did not have limitations in his ability to push and pull. (Tr. 135.) He found neither postural limitations nor any manipulative, visual, communicative, or environmental limitations. (Tr. 136–38.) In short, he concluded that Plaintiff's impairments did not inhibit his ability to function. (Tr. 139.)

Plaintiff also visited the Thurmond Eye Associates in October 2001 for a second ophthalmological opinion on his eye impairments. (Tr. 142–43.) The record of this visit showed that Plaintiff's corrected vision was 20/40 in both eyes and that Plaintiff was advised to avoid strenuous activity and heavy lifting. (*Id.*)

Plaintiff returned to Dr. Joule in December 2001, complaining of shoulder trouble that limited his ability to lift weights or move in certain directions (although this does not appear to be related to any of his listed impairments). (Tr. 146.) In a January 22, 2002 visit, Plaintiff complained of pain in his feet. (Tr. 145.) Dr. Joule recorded decreased sensation in his feet on a wire test. (*Id.*) But she also noted that he had run out of one particular medication and that he was only checking his sugar levels "once in a while." (*Id.*)

Plaintiff next visited Dr. Joule six months later on June 13, 2002. The medical notes indicate that he was "doing good," with blood sugars under control. His shoulder was also better to the point

where he was able to do "more yard work." (Tr. 184.)  In September 2002, he told Dr. Joule that he was unable to afford his medications.  (Tr. 195.)  In February 2003, Plaintiff returned complaining of left foot pain and sporadic dizziness lasting roughly three hours at a time.  (Tr. 183.)  Plaintiff stated that he had fallen off a ladder and injured his left foot, indicating that his left foot pain resulted from the fall.  (*Id.*)  He was treated and released with instructions to watch the foot wound closely for infection.  (*Id.*)  He returned in March 2003 with his foot still tender; however, the wound was healing well.  (Tr. 187.) Dr. Joule noted that Plaintiff's blood sugar was much lower with the use of his medication, but Plaintiff indicated that he experienced dizziness sometimes because of the lower blood sugar level.  (*Id.*)  He also reported experiencing another bleed in his right eye and said that he was seeing his ophthalmologist for this.  (*Id.*)

Plaintiff's final documented visit to Dr. Joule was in May 2003.  He told the doctor that he had discontinued taking all his medications for a while because of dizziness, though he had by then resumed taking them.  (Tr. 186.)  Dr. Joule removed Plaintiff from Lipitor because she felt it was causing the dizziness.  (*Id.*)  She continued to recommend that Plaintiff engage in diet and exercise. (*Id.*)

In July 2003, Dr. Joule completed a Physical Residual Functional Capacity Questionnaire on Plaintiff's behalf.  (Tr. 189–93.)  She listed Plaintiff's impairments as insulin-dependent diabetes mellitus, diabetic retinopathy, diabetic neuropathy, diabetic nephropathy, hyperlipidemia, leg and foot pain, and muscle cramps.  (Tr. 189.)  The symptoms of Plaintiff's impairments were noted to be foot pain, dizziness, gait imbalance, muscle cramps, weakness, shoulder pain, foot and leg numbness, and visual impairment, with the pain being severe in the legs, feet, hands, and chest when muscles cramped.  (*Id.*)  These impairments and symptoms were based on clinical findings of

elevated blood sugar, elevated blood lipids, neovascularization of the retina, decreased sensation in the feet, hammer toes, and gait disturbance. (*Id.*) Dr. Joule indicated that Plaintiff was taking multiple medications to lower blood sugar, lipid, and cholesterol levels, protect his kidneys, and treat his pain. (*Id.*)

Dr. Joule further commented that Plaintiff's symptoms and pain would be severe enough to frequently interfere with his ability to pay attention and concentrate in a work environment. (Tr. 190.) She stated that Plaintiff could walk one block without rest, sit continuously for one hour, stand continuously for twenty minutes, stand/walk for two hours in an eight-hour work day, and sit for six hours in an eight-hour work day. (Tr. 190–91.) In her opinion, Plaintiff was limited to lifting up to ten pounds occasionally, and she stated that Plaintiff was also limited in his ability to do repetitive reaching, fingering, and handling to about twenty percent of the time in an eight-hour work day. (Tr. 192.) Dr. Joule indicated that she did not know whether Plaintiff's impairments would cause him to be absent from work. (*Id.*)

## B.   The Evidentiary Hearing

Plaintiff was represented by counsel at the hearing before the ALJ on August 21, 2003. (Tr. 196–213.) Plaintiff was the only witness at the hearing.[5]

Plaintiff testified that he was forty-four years old, had twenty-eight hours of college education, weighed 250 pounds, and was five feet eleven inches tall. (Tr. 199–200.) He testified regarding his extensive work experience in sewing machine retail and repair, explaining that the heaviest weight he had to lift was usually about 100 pounds. (Tr. 201.) He stated that he was first

---

[5] It should be noted that much of Plaintiff's testimony from the hearing was inaudible, as recorded by the court reporter, and therefore of little help for the purposes of this review.

diagnosed with diabetes when he was nineteen years old. (Tr. 203.) He also testified that his vision had deteriorated since the surgeries and that his vision was fine as long as he did not have to turn his head or bend over and pick something up. (Tr. 203–04.) Plaintiff indicated that his eyes would hurt from reading a newspaper. (Tr. 204.)

He testified that his legs would become numb up to his shin at times and that he had difficulty maintaining balance on uneven surfaces, pointing to the fall he experienced while climbing a ladder. (Tr. 205.) He testified that he experienced numbness, tingling, and cramping in his hands, arms, legs, and chest, depending on how much exercise he did. (Tr. 206.) He also stated that he had a difficult time using his hands for writing and grabbing things if he was experiencing the cramping or numbness. (Tr. 207.) He stated that he did not have a driver's license because he needed glasses and that when he went for glasses he was then told he needed surgery; but, by the time he completed his surgeries and obtained glasses, he failed to go back to get his license. (Tr. 208.) He also mentioned that he had not seen his eye doctor, Dr. Gonzalez, in over a year because he could not afford it. He was attempting to continue treatment with Dr. Joule, and his dad helped buy medications. (Tr. 209.)

Plaintiff felt that he could now lift only five to ten pounds because of his impairments and that he could only sit for thirty minutes before he had to get up and walk around because of leg pain and swelling. (Tr. 209.) He stated that he could stand for thirty minutes, walk one block, bathe himself, dress himself, and tie his shoes. He did no chores around the house, never went grocery shopping, and mostly just stayed at home watching television. (Tr. 210–11.)

## C.   The ALJ's Decision

In making his decision, the ALJ relied on the testimony that was presented at the August

9

2003 hearing and the other medical evidence in the record.  The ALJ recited and then applied the five-step method for evaluating disability claims.[6]  (Tr. 18–19.)

The ALJ first noted that there was no evidence that Plaintiff had engaged in substantial gainful activity since making his claim, thus allowing the ALJ to move to the second step of the evaluation.  The ALJ then determined that Plaintiff suffered from a severe impairment or combination of impairments in the form of his "poorly controlled diabetes secondary to non-compliance," and resulting retinopathy and neuropathy.  (Tr. 19.)

In step three, the ALJ determined that Plaintiff's impairments, though severe, did not singly or in combination equal in severity any disorder set forth in the Listing of Impairments.  In reaching this conclusion, the ALJ relied on the medical consultants' failure to identify any impairment or combination of impairments that met the listings.  (*Id.*)  The ALJ stated that the Plaintiff did not have a loss of vision sufficient to meet the requirements of the listings, given that his corrected vision in his better eye was between 20/25 and 20/40 and his field of vision extended to forty degrees from the point of fixation in the better eye.  (*Id.*)  The ALJ also found that the neuropathy did not cause "sustained disturbance of gross and dextrous movements or gait and station to comport with the severity contemplated by the listing."  (*Id.*)

The ALJ further found that Plaintiff's testimony of subjective complaints and functional limitations, including pain, were not supported by the evidence to the disabling degree alleged.  (*Id.*) The ALJ stated that the Plaintiff had a pain producing impairment but that he was exaggerating the degree of pain experienced.  (*Id.*)  With regard to Plaintiff's testimony that he falls once a week and

---

[6]  The five-step process is further explained later in this report in the Standard of Review section II.A.

experiences numbness and cramping in his hands, the ALJ noted that Plaintiff had applied for benefits primarily on the basis of visual problems. (Tr. 19.) The ALJ also pointed out that the medical record contained complaints of leg pain, but not hand cramping, and that there was evidence of one fall from a ladder, not frequent falls. (Tr. 20.)

The ALJ also emphasized Plaintiff's inconsistent compliance with prescribed medications and blood sugar monitoring, noting that his diabetes was well controlled when he was on insulin. (*Id.*) The ALJ found that Plaintiff's dizziness, pain, and blurred vision were better controlled when he complies with his medical regimen. Ultimately, the ALJ concluded that Plaintiff retained the ability to perform significant activities despite his impairments. (*Id.*)

Turning to Plaintiff's residual functional capacity (RFC), the ALJ determined that while Plaintiff could not return to his previous work, he retained the RFC for at least sedentary work and a limited range of light work. The ALJ stated that Plaintiff could not work at unprotected heights or around dangerous machinery and that his vision problems foreclosed work requiring fine visual acuity. However, these limitations did not significantly limit the available range of sedentary work, as is described in Social Security Ruling (SSR) 85-15.[7] (Tr. 20.) In reaching this conclusion, the ALJ placed principal reliance on the opinions and records of Plaintiff's treating opthamologist, Dr. Gonzalez. While Plaintiff's other treating physician, Dr.Joule, indicated that Plaintiff could only spend twenty percent of the day performing manipulative operations, the ALJ noted that there was no objective medical support in the record for this restriction and that the record only marginally supported Dr. Joule's standing, sitting and walking limitations. (*Id.*)

_____

[7] SSR 85-15 is discussed further in section II.B.1.

Given that Plaintiff could not return to his previous work, the ALJ recognized that the burden of proof shifted to the Commissioner to show that the claimant's age, education, work history, and RFC permit a successful adaptation to a significant number of jobs in the national economy.  (*Id.*)  The ALJ found that Plaintiff had some college education, that he was a younger individual as defined by the regulations, and that his past work was without transferrable skills.  (*Id.*)  Under the Medical-Vocation Guidelines in Subpart P, Appendix 2, of Social Security Regulation No. 4, these findings, together with the ALJ's RFC determination, dictated the conclusion that Plaintiff was not disabled.  The ALJ thus ruled that Plaintiff had not been under a disability at any time during the pendency of his application.

**D.     Procedural History**

On October 1, 2003, Plaintiff sought administrative review of the ALJ's determination.  (Tr. 7.)  The Appeals Council concluded that there was no basis for challenging the ALJ's decision, rendering it the Commissioner's final decision for purposes of judicial review.  (Tr. 11–14.)  The instant action followed.  (Docket No. 1.)  The parties have filed cross motions for summary judgment and indicated their desire to have the case decided on the submissions.  (Docket Nos. 10, 19, 21.)  The parties subsequently consented to allowing a United States Magistrate Judge conduct all proceedings, including trial and judgment, pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.  (Docket No. 22.)

## II.  ANALYSIS

**A.     Standard of Review**

To qualify for DIB under the Social Security Act (the "Act"), Plaintiff  bears the burden of proving that he is disabled.  The Act defines disability as the "inability to engage  in any substantial

12

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 423(d)(3).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)    whether the claimant is currently working in substantial gainful employment;

(2)    whether the claimant suffers from a severe impairment;

(3)    whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)    whether the claimant is capable of returning to his past relevant work; and, if not,

(5)    whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. § 404.1520.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *See Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994). At steps one through four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at step five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th

13

Cir. 2002).  In this case, the ALJ reached step five because he concluded at step four that Plaintiff

was unable to perform work that he had done in the past.  Thus, the Commissioner had the burden

of proof to show that there were other types of employment that Plaintiff could perform.

A federal court's review of the Commissioner's final decision is limited to determining

whether the Commissioner applied the correct legal standards and whether the decision is supported

by substantial evidence in the record as a whole.  *Id.*  Substantial evidence is such relevant evidence

as a reasonable mind might accept to support a conclusion.  *See Boyd v. Apfel*, 239 F.3d 698, 704

(5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no

substantial evidence is appropriate only if no credible evidentiary choices or medical findings

support the decision.  *Id.*  Evidentiary conflicts, however, are for the Commissioner to resolve, not

the courts.  *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  This Court may neither re-weigh the

evidence in the record nor substitute its judgment for the Commissioner's, but will carefully

scrutinize the record to determine if substantial evidence is present.  *See Harris v. Apfel*, 209 F.3d

413, 417 (5th Cir. 2000).  In applying this deferential standard, however, the Court is not a "rubber

stamp" for the Commissioner's decision, particularly given the importance of the benefits in

question.  *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 500 (S.D.Tex. 2003).

## B.    Issues

In moving for summary judgment, Plaintiff asserts two points of error.  First, Plaintiff argues

that given the ALJ's finding that Plaintiff's RFC was limited by his inability to perform work

requiring fine visual acuity, the ALJ erred in failing to obtain expert vocational testimony as to what

work (if any) he could perform.  Second, Plaintiff argues that the ALJ erred in failing to recontact

one of his treating physicians for clarification of her opinion regarding his RFC.  Each of these points

14

will be discussed in the context of the standard of review explained above.

## C.    Need for a Vocational Expert

Once the ALJ found that Plaintiff was unable to perform his previous work at step four, the burden of proof shifted to the Administration at step five to determine whether Plaintiff could perform any other work available in the national economy.  20 C.F.R. § 404.1520(f); *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  In making the step five determination, the ALJ must consider the claimant's age, education, work history, and RFC.  (*Id.*)  The Fifth Circuit has held that "the ALJ may rely exclusively on the [Medical-Vocational] Guidelines in determining whether there is other work available that the claimant can perform" where two conditions are met: (1) when the claimant's age, education, and work history correspond to the criteria in the Medical-Vocational Guidelines (the "Guidelines") of the regulations, 20 C.F.R. § 404, Subpart P, App. 2, and (2) the claimant "either suffers only from exertional impairments or his non-exertional impairments do not significantly affect his RFC." *Fraga*, 810 F.2d at 1304.  Otherwise, where a claimant's impairments are purely nonexertional or where the nonexertional impairments have a significant impact on his RFC, "the ALJ must rely upon expert vocational testimony or other similar evidence to establish that such jobs exist." *Id.*

Here, the ALJ properly considered Plaintiff's age, education, work history, and RFC in determining whether Plaintiff could perform other available work.  (Tr. 20.)  The ALJ found that Plaintiff's RFC allowed him to perform at least sedentary work and a limited range of light work. (Tr. 20.)  The ALJ also found that Plaintiff's visual limitations precluded him from performing work requiring fine visual acuity.  (*Id.*)

It is undisputed that Plaintiff's visual limitations constitute a nonexertional impairment.

Plaintiff thus argues that the ALJ's holding that Plaintiff could not perform work requiring fine visual acuity necessarily results in a significant limitation on his RFC caused by a nonexertional impairment. If this were the case, *Fraga* would foreclose reliance solely on the Guidelines and would instead necessitate expert vocational testimony to establish whether there are jobs available in the national economy that Plaintiff can perform. In making this argument, Plaintiff relies on SSR 96-9p, which states that because most sedentary unskilled occupations require working with small objects, where an individual has a visual limitation that prevents him from seeing the small objects or from avoiding ordinary workplace hazards, there will be a significant erosion of the sedentary occupational base. While SSR 96-9p illustrates the effect of a visual impairment on the number of jobs available within the unskilled sedentary occupational base, it says nothing regarding whether a particular visual impairment significantly affects an individual's functional capacity to perform a particular job within the diminished job base. In addition, SSR 96-9p should be read in conjunction with SSR 85-15, which states:

> [E]ven if a person's visual impairment(s) were to eliminate all jobs that include very good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels.

In accordance with SSR 85-15, an ALJ should evaluate "how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations."

Applying this standard, the ALJ here found that Plaintiff's visual impairments did not significantly limit the available range of sedentary work in which he might adequately function. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2). Sedentary work involves "lifting no more than

16

10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." SSR 83-10.

The ALJ's finding on this issue is consistent with the opinions and records of Dr. Gonzalez, who was Plaintiff's treating ophthalmologist.  Dr. Gonzalez found that Plaintiff's best corrected vision was 20/30 in the right eye and 20/25 in the left.  (Tr. 133.)  The only functional limitation imposed by Dr. Gonzalez was that Plaintiff should not lift over twenty-five pounds or operate heavy machinery.  (*Id.*)  Otherwise, Plaintiff could walk, stand, drive, hear, and talk normally.  (*Id.*)  The ALJ's finding is also consistent with Dr. Spoor's assessment (based on the results of another ophthalmological examination) and with the ophthalmological opinion by Thurmond Eye Associates—both of which concluded that Plaintiff should avoid heavy lifting and dangerous work environments.  None of these opinions suggested that Plaintiff would have any problem with ordinary workplace hazards, nor did they find any other vision-related limitations.

Such evidence adequately supports the ALJ's finding that Plaintiff's visual impairments would not significantly restrict his ability to perform sedentary work.  Thus, the ALJ properly relied solely on the Guidelines in determining that work existed in the national economy that Plaintiff could perform in light of his age, education, and work history.  *Fraga*, 810 F.2d at 1305.

**D.**     **Need to Recontact the Treating Physician**

Plaintiff's second argument is that the ALJ's decision is not supported by substantial evidence and is inconsistent with applicable legal standards because the ALJ failed to recontact his treating physician, Dr. Joule, to clarify her opinion on Plaintiff's RFC.  Plaintiff faults the ALJ's

"boilerplate" rejection of Dr. Joule's opinions (1) that Plaintiff could not perform manipulative functions for more than twenty percent of an eight-hour work day and (2) that his ability to work at a regular job on a sustained basis was compromised by his severely limited vision and balance. (Docket No. 21 at 5–6.)  According to Plaintiff, the ALJ failed to follow the regulations (specifically, 20 C.F.R. § 404.1512(e)(1)) and SSR 96-5 when he did not recontact Dr. Joule for clarification, given that his RFC determination is contrary to these two opinions.

Opinions by treating physicians are given special significance in disability determinations. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight."  20 C.F.R. § 404.1527(d)(2); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  Ultimately, however, "the ALJ has sole responsibility for determining a claimant's disability status," and "the ALJ is free to reject the opinion of any physician *when the evidence supports a contrary conclusion*."  *Newton*, 209 F.3d at 455 (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)) (emphasis added).  The opinions of treating physicians "may be assigned little or no weight when good cause is shown."  *Newton*, 209 F.3d at 455–56.  Good cause exists when a treating source's opinion is conclusory, unsupported by medically acceptable evidence, or is otherwise bereft of substantial support.  *Id.* at 456.

The ALJ also had a duty "to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); 20 C.F.R. § 404.1512(d), (e).  Generally speaking, this means that the ALJ should not reject a treating physician's opinion without first recontacting the physician to attempt to fill any gaps in the record.  *See Newton*, 209

18

F.3d at 457–58.  But the critical question is "whether the decision of the ALJ is supported by substantial evidence in the existing record." *Ripley*, 67 F.3d at 557; *see also Glass v. Barnhart*, 158 Fed. Appx. 530, 532 (5th Cir. Nov. 28, 2005) (noting that the "proper inquiry" regarding evidence from treating physicians is "the substantiality of the evidence on record to support the ALJ's ruling") (unpublished decision).[8]

In arguing that the ALJ should have recontacted Dr. Joule, Plaintiff first points to the ALJ's decision not to credit Dr. Joule's opinion that Plaintiff could only use his upper extremities for repetitive reaching, handling, and fingering for up to twenty percent of an eight-hour work day.  The ALJ found that "there is no objective medical basis for the manipulative limitations." (Tr. 20.)  This finding is supported by the extensive medical record, including Dr. Joule's own records.  Never once in Dr. Joule's records of her treatment of Plaintiff does she indicate that Plaintiff had complained of or had difficulty with his hands or arms, other than a shoulder injury.  That injury appears to have been caused not by diabetes-related complications, and, in any event, Plaintiff indicated to Dr. Joule that his shoulder was doing better to the point where he had returned to doing more yard work.  (Tr. 184.)  In fact, only once in the medical record did Plaintiff complain of pain in his hands.  This was during an examination by Dr. Glazer, who noted that there was no swelling or redness and that Plaintiff stated that he had no difficulty carrying groceries, tying shoes, or going shopping. (Tr. 126.)

---

[8] The Court notes that an ALJ cannot reject the opinion of a treating physician without performing a detailed analysis of the treating physician's views under the criteria in 20 C.F.R. § 404.1527(d)(2), unless the record contains "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist."  *Newton*, 209 F.3d at 453.  Here, there was reliable medical evidence from other treating and examining physicians controverting the opinion of Dr. Joule.  Thus, the ALJ need not have discussed the *Newton* factors in rejecting Dr. Joule's opinion.

Based on the lack of evidence in Dr. Joule's records and the controverting evidence from Dr. Glazer's examination, the undersigned finds that the ALJ's decision to not fully credit Dr. Joule's opinion regarding Plaintiff's ability to manipulate objects is supported by substantial evidence.[9]

Turning to the other opinion cited by Plaintiff, Dr. Joule also stated that Plaintiff's ability to maintain a regular job was affected by his "severely limited vision and balance." But Dr. Joule's characterization of Plaintiff's vision is inconsistent with the opinions of another treating physician, Dr. Gonzalez, who is a specialist in diseases and surgeries of the retina and vitreous. Dr. Gonzalez's records reflect that Plaintiff's corrected vision was 20/30 in the right eye and 20/25 in the left eye. While Dr. Gonzalez instructed Plaintiff not to lift objects over twenty-five pounds or operate heavy machinery, he opined that Plaintiff otherwise could "walk, stand, drive, hear and talk normally." (Tr. 133.)

This assessment is further corroborated by the ophthalmological exam performed at the Thurmond Eye Institute. This examination established that Plaintiff's corrected vision was 20/40 and concluded that Plaintiff should avoid strenuous activity and heavy lifting—restrictions almost identical to those offered by Dr. Gonzalez and not inconsistent with Plaintiff's RFC as found by the ALJ. (Tr. 142–43.) In addition, the record contains yet another ophthalmological exam and assessment completed for DDS, which was likewise consistent with Dr. Gonzalez's opinion and the ALJ's RFC determination. (Tr. 88–92.). The opinions and records from these treating and

---

[9] The ALJ's decision in this regard is also supported by the opinions of two consulting physicians, Drs. Spoor and Samaratunga, both of whom found that Plaintiff's impairments did not limit his ability to perform at least light work. Dr. Samaratunga specifically noted that the medical records did not reflect any manipulative limitations. (Tr. 135-38.)

examining physicians provide substantial evidence in support of the ALJ's finding that Plaintiff's visual limitations did "not significantly limit the available range of sedentary work" that Plaintiff could perform.

Because the ALJ's RFC determination—including his decision to not fully credit Dr. Joule's opinions—is supported by substantial evidence, he did not err in failing to recontact Dr. Joule or otherwise further develop the record.[10]

In addition, there is another reason that Plaintiff cannot prevail on this issue.  A court will reverse the ALJ's failure to further develop the record "only if the applicant shows prejudice from the ALJ's failure to request additional information."  *Newton*, 209 F.3d at 458.  "To establish prejudice, a claimant must show that he could and would have adduced evidence that might have altered the result."  *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (internal quotations and citation omitted).  Here, Plaintiff has made no showing that Dr. Joule would have produced additional evidence helpful to his position, and he thereby fails to establish prejudice necessary to support a reversal.  *Newton*, 209 F.3d at 458.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Docket No. 10) is GRANTED and Plaintiff's Motion for Summary Judgment (Docket No. 21) is DENIED.  A final judgment dismissing this action will be entered by separate order.

---

[10]  While not arising to the level of reversible error, the undersigned believes that further development of the record would have been the better practice in this case.

DONE at McAllen, Texas on March 30, 2007.

Peter E. Ormsby

UNITED STATES MAGISTRATE JUDGE